UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WALTER BRUMBAUGH,            :
                             :CIVIL ACTION NO. 3:14-CV-888
            Plaintiff,       :
                             :(JUDGE CONABOY)
            v.               :
                             :
CAROLYN COLVIN,              :
Acting Commissioner of       :
Social Security,             :
                             :
            Defendant.       :
                             :

_____

**MEMORANDUM**

Here we consider Plaintiff's Appeal of Defendant's denial of
Disability Insurance Benefits ("DIB") under Title II of the Social
Security Act ("Act"), 42 U.S.C. §§ 401-433.  (Doc. 1.)  The
Administrative Law Judge ("ALJ") who evaluated the claim found that
Plaintiff had the residual function capacity ("RFC") to perform
light work with certain limitations and that such work was
available.  (R. 15-27.)  The ALJ therefore denied Plaintiff's claim
for benefits.  (R. 27.)  With this action, Plaintiff argues that
the decision of the Social Security Administration is error because
the ALJ's credibility determination is not supported by substantial
evidence.  (Doc. 15 at 4.)  For the reasons discussed below, we
conclude Plaintiff's appeal of the Acting Commissioner's decision
is properly granted.

**I. Background**

**A.   *Procedural Background***

On August 19, 2011, Plaintiff filed an application for DIB

alleging disability beginning on April 29, 2011.  (R. 99.)   In the Disability Report, Plaintiff listed five conditions that rendered him unable to work: 1) bulging discs in his back; 2) degenerative discs in his back; 3) depression; 4) liver problems; and 5) arthritis in his lower back and shoulders.  (R. 161.)   The claims were initially denied on September 27, 2011.  (R. 72.)   Plaintiff filed a request for a review before an ALJ on November 4, 2011. (R. 79-80.)  On October 3, 2012, Plaintiff, with his attorney, appeared at a hearing before ALJ Therese A. Hardiman.  (R. 32.) Vocational Expert Frances Terry also testified at the hearing. (*Id.*)  At the hearing, Plaintiff amended his alleged onset date of disability to December 31, 2010.  (R. 55.)  The ALJ issued her unfavorable decision on December 17, 2012, finding that Plaintiff was not disabled under the Social Security Act during the relevant time period.  (R. 27.)

On February 11, 2013, Plaintiff filed a Request for Review with the Appeal's Council.  (R. 13-14.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on March 12, 2014.  (R. 1-4.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)

On May 8, 2014, Plaintiff filed his action in this Court appealing the Acting Commissioner's decision. (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on July 8, 2014.  (Docs. 13, 14.)  Plaintiff filed his supporting

2

brief on August 22, 2014.  (Doc. 15.)  Defendant filed her
opposition brief on September 24, 2014.  (Doc. 18.)
Plaintiff did not file a reply brief, and the time for doing so has
passed.  Therefore, this matter is ripe for disposition.

**B.   *Factual Background***

     Plaintiff was born on August 8, 1972.  (R. 116.)  He completed
ninth grade and had vocational training in electronic technology.
(R. 38, 162.)  Plaintiff last worked as a laborer at Hanna
Electric, a position he held from January 2000 to April 2011.  (R.
51, 140.)  In the Disability Report he stated that he stopped
working because of his conditions.  (R. 161.)  As noted above,
Plaintiff initially claimed disability due to the following: 1)
bulging discs in his back; 2) degenerative discs in his back; 3)
depression; 4) liver problems; and 5) arthritis in his lower back
and shoulders.  (R. 161.)

**1.   Physical Impairment Evidence**

     In April 2010, a Geisinger report indicates Plaintiff
underwent MRI of the lumbar spine due to a history of chronic low
back pain which had been treated with physical therapy and muscle
relaxants.  (R. 177.)  A lumbar spine x-ray had been abnormal and
Plaintiff had been referred to the Spine Clinic.  (*Id.*)  The study
showed mild disc narrowing and desiccation at L4-5 which had
worsened since the previous exam; a posterior high T2 signal
annular tear of the disc and central and left paracentral disc

hernia had developed since the prior exam.  (*Id.*)

On May 2, 2011, Plaintiff was seen at Bucktail Medical Center and reported that he needed pain management for his back pain.  (R. 252.)  The provider offered Plaintiff back injections, but Plaintiff was not interested, preferring more conservative treatment--rest, Tramadol, heat/ice.  (*Id.*)

On May 4, 2011, Geisinger records indicate Plaintiff subjectively reported his general health to be poor.  (R. 243.) Problems identified included the following: pain, stiffness and swelling in joints; muscle cramps and weakness; difficulty walking/standing/sitting; cold extremities; numbness/tingling; headaches; depression; sleep problems; uncontrolled anger; and difficulty making decisions.  (*Id.*)  The Medical History indicates Plaintiff was taking Tramadol, Citalopram and Methocarbanol for his back problems and depression.  (R. 244.)

On May 18, 2011, Plaintiff was seen at Bucktail Medical Center for follow-up on back pain.  (R. 251.)  It was assessed that Plaintiff had lumbar radiculopathy and recommended that he try physical therapy and have MRI.  (*Id.*)

At the May 24, 2011, initial Physical Therapy Evaluation at Bucktail Medical Center, Plaintiff stated that he had back, shoulder, and neck pain for years with a flare up about three months before the evaluation.  (R. 189.)  He rated his shoulder pain 2/10, made worse by sleeping, and his lumbosacral pain 5/10,

4

made better in certain positions and worse with sitting. (*Id.*)
Evaluator Karen Johnson noted possible disc pathology. (*Id.*)  Ms.
Johnson believed that Plaintiff would benefit from physical therapy
and planned to see him twice a week for six weeks. (*Id.*)

A June 15, 2011, Physical Therapy Discharge Summary from
Bucktail Medical Center indicates that after three and one-half
weeks of physical therapy (beginning on May 24, 2011) Plaintiff
continued to have a moderate amount of pain, subjectively rated as
follows: 4/10 in his neck; 6/10 in the low back; and 8/10 in the
thoracic spine. (R. 181.)  The Discharge Report also noted that
Plaintiff had a moderate amount of muscle spasm in the thoracic
spine; cervical range of motion in flexion and extension within
normal limits; rotation and side bend limited bilaterally and
painful; lumbosacral range of motion in flexion of 20 degrees; side
bend and rotation limited 50 percent bilaterally and painful.
(*Id.*)  Plaintiff had no significant improvement with his course of
therapy. (*Id.*)  Plaintiff's physical therapist, Karen Johnson,
referred him back to his physician, recommending he have MRI of his
neck, thoracic spine, and lumbar spine. (*Id.*)

On June 24, 2011, Plaintiff had MRI of the lumbar spine at 611
MRI-CT. (R. 196.)  Impressions were "[m]ild, broad-based,
posterior disc protrusion at L4-L5, about the same[;] . . . mild
central canal narrowing and moderate facet osteoarthropathy at this
level[;] [v]ery small, broad-based focal disc bulge at L5-S1, also

5

about the same." (*Id.*)

On July 7, 2011, Dr. Herberg completed a "Continuing Disability Claim Form" opining that Plaintiff had been disabled and unable to perform his occupation or any occupation from April 29, 2011, to July 7, 2011, due to cervical and lumbar pain, muscle spasms, and L4-L5 disc bulge. (R. 256.) Dr. Herberg noted that Plaintiff had a neuro surgical appointment scheduled for August 2, 2011. (*Id.*) Dr. Herberg did not know when Plaintiff would be able to resume his occupation, but he anticipated within six to twelve months. (*Id.*)

On July 25, 2011, Plaintiff saw Dr. Herberg and reported a decrease in feeling in his arms as well as other symptoms. (R. 250.) Dr. Herberg's notations include lumbar radiculopathy, adding that Plaintiff had a neuro surgical appointment pending for L4-L5 disc protrusion. (R. 250.)

On August 2, 2011, Plaintiff saw Rodwan K. Rajjoub, M.D., at Lycoming Medical Associates complaining mainly of low back and bilateral leg pain. (R. 224.) Plaintiff's pain was reported to average six on a scale of one to ten, increasing to nine at its worst; the pain was constant, worsening at times; it was aggravated by sitting, standing, and bending forward; the pain was relieved by heat and "swimming pool"; his sleep and physical activity had decreased because of the pain; and he had a history of liver disease and depression. (*Id.*) Social History includes notations

that Plaintiff stopped working due to pain.  (R. 225.)  By
examination, Dr. Rajjoub found the following: normal appearance of
spine; normal gait; normal heel and toe walking; range of motion of
the lumbar spine revealed forward flexion to seventy-five degrees,
extension to ten degrees, right lateral flexion to twenty degrees,
and left lateral flexion to twenty degrees; painful flexion of
spine; not-painful extension of spine; negative Patrick's; positive
left straight leg raise; and negative right straight leg raise.
(R. 228.)  Dr. Rajjoub's Assessment showed the following: small HNP
L4-5; low back pain syndrome; bilateral lumbar radiculopathy;
degenerative lumbar disc disease L4-5; liver disease; and
depression.  (*Id.*)  Based on his findings, Dr. Rajjoub did not
recommend surgery.  (*Id.*)  He advised Plaintiff to continue
conservative treatment with moist heat, massage, and exercises.
(*Id.*)

     Plaintiff had an electrodiagnostics consultation with Dr.
Colin McCaul, M.D., on August 19, 2011, at Nittany Valley Medical
Associates.  (R. 231.)  The consultation was at the request of Drs.
Herberg and Jones-Sutliff to evaluate the numbness, tingling and
decreased grip in both hands.  (*Id.*)  Dr. McCaul found evidence of
bilateral ulnar neuropathies at the elbow which are usually the
result of chronic leaning on the elbow and/or an easily subluxable
ulnar nerve at this location.  (R. 232.)  Dr. McCaul recommended
avoidance of leaning on the elbow.  (*Id.*)  He could not entirely

rule out a cervical radiculopathy, having had trouble examining Plaintiff's cervical paraspinals due to poor patient relaxation. (*Id.*)

On August 28, 2011, Plaintiff was seen at Bucktail Medical Center and reported low back and shoulder pain, and bilateral hand numbness. (R. 248.)  Plaintiff had increased his activity levels over the preceding month with increased pain and numbness. (*Id.*) He reported that pain medication gave him some relief. (*Id.*) The provider noted lumbar pain and that he/she was awaiting Dr. Rajjoub's consultation note. (R. 249.)

On September 12, 2011, Plaintiff was seen for follow-up at Bucktail Medical Center. (R. 248.)  He reported that he was unable to work his former job duties due to pain and spasms and decreased abilities to walk, stand and sit. (*Id.*)  The provider assessed hand numbness/tingling and lumbar back pain. (*Id.*)

On September 9, 2011, James Herberg, M.D., completed a Residual Functional Capacity Questionnaire. (R. 235-36.)  Dr. Herberg had begun treating Plaintiff for general medical care in February 2011. (R. 235.)  Dr. Herberg's diagnosis includes low back pain syndrome and lumbar radiculopathy.[1]  He determined Plaintiff's prognosis to be guarded and identified symptoms including neck and back pain and muscle spasms which limited his

---

[1]  Dr. Herberg's notations are not all legible. (R. 235-36.)

8

ability to work.[2]  (*Id.*)  Dr. Herberg opined that these symptoms often interfered with the attention and concentration required to perform simple work-related activities; side effects of medications, including dizziness and fatigue, could also impact Plaintiff's ability to work.  (*Id.*)  Dr. Herberg made the following findings: Plaintiff would have to recline or lie down more than the typical work day break periods; he could walk three to four city blocks without rest or significant pain; he could sit for twenty minutes and stand/walk for thirty minutes; in an eight-hour workday, Plaintiff could sit for four to five hours and stand for the same period of time (with some variation); and Plaintiff would need to take unscheduled breaks during the workday, perhaps once every hour for fifteen to twenty minutes.  (R. 235.)  Dr. Herberg further opined that Plaintiff could lift less than ten pounds frequently, ten to twenty pounds occasionally, and could never lift fifty pounds; Plaintiff had limitations in doing repetitive reaching, handling or fingering; and he would miss work more than four times per month due to his impairments.  (R. 236.)  Dr. Herberg noted that it was unknown whether Plaintiff was a malingerer.  (*Id.*)  He found Plaintiff's impairments (physical and emotional) to be reasonably consistent with the symptoms and functional limitations found in the evaluation; he did not identify any other limitations (such as psychological) that would affect

---

[2]  *See supra* n.1.

Plaintiff's ability to work at a regular job on a sustained basis. (*Id.*)

On September 23, 2011, Plaintiff called Bucktail Medical Center reporting that he was denied disability benefits.  (R. 302.) He wanted to be called "to discuss his abuse to alcohol use" and "said if you write a paragraph with the issues Lawyer is setting him up with a Psych Doctor mental disability."  (*Id.*)

On September 27, 2011, SDM Melissa A. Seelye completed the Disability Determination Explanation as it relates to Plaintiff's back impairments.[3]  (R. 66-71.)  She concluded that Plaintiff's medically determinable impairments could reasonably be expected to produce Plaintiff's pain and other symptoms.  (R. 66.)  Ms. Seelye found that Plaintiff's statements about the intensity, persistence, and functionally limiting effects of his symptoms were not substantiated by the medical evidence alone: most informative factors in assessing his credibility were his activities of daily living; the location, duration and intensity of his pain and other symptoms; and precipitating and aggravating factors.  (R. 66.)  She found Plaintiff partially credible.  (R. 67.)  Having reviewed Dr. Herberg's September 2011 RFC Questionnaire (*see* R. 63), Ms. Seelye assessed Plaintiff's residual functional capacity, stating that no medical source and/or other opinions about Plaintiff's limitations

---

[3]  A single decision-maker ("SDM") is a non-examining, non-medical employee at the state agency level.  *Yorkus v. Astrue*, No. Civ. A. 10-2197, 2011 WL 7400189, at *4 (E.D. Pa. Feb. 28. 2011).

were more restrictive than her findings.  (R. 68-69.)  Ms. Seelye concluded Plaintiff was not disabled: he was capable of sedentary work and could perform jobs such as addresser, lens inserter, and compact assembler which existed in significant numbers in the national economy.  (R. 70.)

On February 1, 2012, Plaintiff had a new patient visit at the Family Practice of Renovo with Carey Conley, M.D.  (R. 284.) Plaintiff reported that he had been off work since May 28, 2011, due to back pain and would like to go back to work but could not due to back pain and muscle spasm.  (R. 284.)  Plaintiff needed disability forms completed, but Dr. Conley noted forms could not be filled out based on one visit.  (*Id.*)

On March 6, 2012, Plaintiff had a follow-up visit and reported that his back was no better.  (R. 295.)  Dr. Conley prescribed Tramadol and Hydrocodone, and instructed Plaintiff to apply heat. (*Id.*)

On June 29, 2012, Plaintiff saw Dr. Conley for a follow-up on his back pain.  (R. 394.)  Plaintiff reported that his medications were not working.[4]  (*Id.*)

On July 6, 2012, Plaintiff had a follow-up visit with Dr. Conley.  (R. 286.)  His depression was noted to be stable.[5]  (*Id.*)

On September 7, 2012, Frank Conley, M.D., completed a Residual

---

[4]  Other notations are not legible.

[5]  *See supra* n.4.

11

Functional Capacity Questionnaire.  (R. 307-09.)  He noted that
Plaintiff was treated for chronic low back pain, had a herniated
disc in his lumbar spine, and his prognosis was guarded.  (R. 308.)
Dr. Conley opined that Plaintiff's symptoms constantly interfered
with the attention and concentration required to perform simple
work-related tasks but Plaintiff had no side effects of medications
which would impact his ability to work.  (*Id.*)  Dr. Conley also
made the following findings: Plaintiff would have to recline or lie
down more than the typical work day break periods; he could not
walk any city blocks without rest or significant pain; he could sit
and stand/walk for fifteen minutes; in an eight-hour workday,
Plaintiff could sit for two hours and stand for the same period of
time; he would need to change positions at will; and Plaintiff
would need to take unscheduled breaks during the workday, perhaps
three times an hour for five to ten minutes.  (R. 308.)   Dr.
Conley further opined that Plaintiff could lift less than ten
pounds and ten pounds occasionally, and could never lift over ten
pounds; Plaintiff had limitations in doing repetitive reaching,
handling or fingering; and he would miss work more three or four
times per month due to his impairments.  (R. 309.)  Dr. Conley
noted that Plaintiff was not a malingerer.  (*Id.*)  He found
Plaintiff's impairments (physical and emotional) to be reasonably
consistent with the symptoms and functional limitations found in
the evaluation.  (*Id.*)  Dr. Conley concluded Plaintiff was not

12

capable of working an eight-hour day five days a week on a
sustained basis.  (*Id.*)

## 2.   **Mental Impairment Records**

On April 6, 2011, Plaintiff visited the Bucktail Medical
Center Emergency Department complaining of lack of energy,
decreased libido, feelings of unhappiness and increased emotional
stress.  (R. 206.)   Lower back pain and insomnia were noted to be
modifying factors.  (*Id.*)  By history, Plaintiff was diagnosed with
depression; he was not suicidal or homicidal.  (*Id.*)

On April 15, 2011, Plaintiff was seen for follow up for
"depression c/o back pain."  (R. 253.)   He reported the medication
he had been given was working well.  (*Id.*)

On September 9, 2011, Dr. Herberg completed a Mental Capacity
Assessment.  (R. 237-40.)  Dr. Herberg opined that Plaintiff had no
psychological limitations, only physical.  (R. 238.)

On September 26, 2011, state agency psychological consultant
John Rohar, Ph.D., found that Plaintiff's mental impairments are
non severe as defined in the regulations.  (R. 66.)

As noted above, on July 6, 2012, Plaintiff had a follow-up
visit with Dr. Conley.  (R. 286.)   His depression was noted to be
stable.[6]  (*Id.*)

## 3.   **Function Reports and ALJ Hearing Testimony**

In the "Function Report - Adult" completed on September 15,

---

[6]   *See supra* n.4.

2011, Plaintiff stated that his illnesses, injuries or conditions limited his ability to work in the following ways: he cannot lift more than ten pounds; he cannot stand very long and has a hard time getting around in the morning; bending and twisting are very hard on him; he can't pull wire, twist pipe, carry pipe, dig ditches, climb ladders or run lifts.  (R. 119.)  Plaintiff summarized his limitations with the statement that "more or less can't do what I know how to do."  (*Id.*)

    Plaintiff described his daily activities as follows: he takes medications in the morning and throughout the day; he does dishes and laundry and some dusting when he can though he needs to take breaks when doing these activities; he watches TV, sits on the porch and goes in the pool.  (R. 120, 121.)  Plaintiff states that he does small things for his wife and children, noting that he used to do everything.  (R. 120.)  Before his illnesses, injuries or conditions limited his abilities, he worked on cars, did dry wall and roofing, and he mowed the grass.  (*Id.*)  His sleep has been affected--he tosses and turns and is up and down all night.  (*Id.*)  Plaintiff manages his own personal care but has difficulty with dressing, bathing and shaving.  (*Id.*)  Plaintiff cooks less than he used to and does not do yard work because of the pain.  (R. 121, 122.)  He sometimes drives and shops for up to two hours, needing to take breaks when shopping.  (R. 122.)  Since the illnesses, injuries or conditions began, Plaintiff no longer engages in many

hobbies and interests he had previously (cars, hunting, camping, working), but he watches TV and is in the swimming pool more.  (R. 123.)

Plaintiff indicated his illnesses, injuries or conditions affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, and use his hands.  (R. 124.) His memory and concentration have also been affected.  (*Id.*) Regarding changes in social activities since the illnesses, injuries or conditions began, Plaintiff responded that he can't do anything.  (R. 124.)  He also reported that he has a hard time handling stress and cannot handle changes in routine.  (R. 125.)

In a Supplemental Function Questionnaire, Plaintiff stated that he had pain for ten years, it had gotten bad over the past three years, and since May of 2011 he had not worked because of the pain.  (R. 127.)  On a scale of one to ten, he rated the pain as eight, the pain worsens morning and night, and lasts about eighty percent of the day.  (Id.)

On September 15, 2011, Plaintiff's wife, Melissa Brumbaugh, completed a "Function Report Adult (Third Party)."  (R. 131.)  Her assessments basically comport with Plaintiff's.  (*See* R. 131-138.)

At the ALJ hearing on October 3, 2012, Plaintiff testified that he was receiving unemployment compensation.  (R. 39.)  He reported that he had not worked at all since the amended onset date of May 28, 2011, and he had filed a worker's compensation claim.

(R. 40.)   Plaintiff was not receiving any psychological care or counseling at the times.  (*Id.*)  He reported that his relationships with his family are "excellent."  (R. 42.)  Plaintiff's testimony regarding activities of daily living was similar to that set out in the Function Report.  (*See*, *e.g.*, R. 41-42.)  He added that he goes up and down the stairs at his house "a couple" times a day, he has to lie down "for a couple of hours" from the morning until three or four in the afternoon, on bad days (which occur about once a week) he cannot get out of bed, and he gets about three to three and a half hours of sleep a night because of his pain.  (R. 42, 45, 49, 50.)  Plaintiff testified that he can sit or stand for fifteen minutes then he's up and down and can walk three "not very long" blocks.  (R. 46.)  At the time of the hearing, Plaintiff was taking Tramadol and Voltaren for pain and Celexa for depression.  (R. 46-47.)  He reported that the medications ease the pain but do not take it away, adding that "[i]t makes it somewhat tolerable throughout the day."  (R. 47.)  Plaintiff said the Cylexa was helping his depression and he was not aware of any side effects from his medication.  (*Id.*)  To help reduce or control his symptoms, Plaintiff also does stretching exercises recommended by a physical therapist.  (*Id.*)  Plaintiff was using a cane at the time of the hearing, noting that he got it on his own and uses it when he is "having a bad time."  (R. 48.)

After noting that Plaintiff's work history was very good up

16

until 2011, Plaintiff's attorney asked Plaintiff what happened at his last job. (R. 51.) Plaintiff explained that he had worked for Hanna Electric for at least ten years and it got to the point that he was missing work because of his back. (*Id.*) His employer said that he wanted to lay Plaintiff off to see if he could get his back in better shape; if not, he would not be able to return to work. (*Id.*) When asked if he felt that he was able to perform fulltime work since he had been laid off, Plaintiff responded that he could not. (*Id.*) Plaintiff also said his depression was partly attributable to the fact that he wanted to be able to support his family and would have kept working if he could have. (R. 52.)

The vocational expert testified that a hypothetical individual of Plaintiff's age, education, and work experience with a capacity to do light work with certain limitations, could not perform any of Plaintiff's past relevant work. (R. 55-56.) The individual, however, could perform other work in the regional or national economy, including hotel desk clerk, general office clerk and fast food worker. (R. 56.) If a sit/stand option were added to the limitations, the hypothetical individual could perform the office clerk position; the hotel desk clerk position would be limited by fifty percent; the vocational expert would add a ticket taker position. (R. 57.) If the hypothetical individual were further limited in that he would require breaks of varying lengths in excess of the normal involved, may be reasonably expected to be

17

absent in excess of three times per month and reasonably expected to be off task twenty percent of the day, the vocational expert testified that such an individual could not perform any other work in the regional or national economy.  (R. 59,)

## 4.   **ALJ Decision**

By decision of December 17, 2012, ALJ Hardiman determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from April 11, 2011, through the date of the decision. (R. 27.)  She made the following findings of fact and conclusions of law:

> 1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.
>
> 2.   The claimant has not engaged in substantial gainful activity since April 29, 2011, the alleged onset date (20 CFR 404.1571 et seq.).
>
> 3.   The claimant has the following severe impairments: degenerative disc disease/degenerative joint disease of the lumbar spine (20 CRF 404.1520(c)).
>
> 4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d),404.1525 and 404.1526).
>
> 5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant is limited to occasional pushing/pulling with the

18

upper extremities.  He is limited to
occasional climbing, balancing, and
stooping, but never on ladders.  He has
a bilateral overhead reach limitation
and he must avoid vibrations and
hazards.

6.   The claimant is unable to perform any
     past relevant work (20 CFR 404.1565).

7.   The claimant was born on August 8, 1972
     and was 38 years old, which is defined
     as a younger individual age 18-49, on
     the alleged disability onset date (20
     CFR 404.1563).

8.   The claimant has a limited education and
     is able to communicate in English (20
     CFR 404.1564).

9.   Transferability of job skills is not
     material to the determination of
     disability because using the Medical-
     Vocational Rules as a framework supports
     a finding that the claimant is "not
     disabled," whether or not the claimant
     has transferable job skills (See SSR 82-
     41 and 20 CFR Part 404, Subpart P,
     Appendix 2).

10.  Considering the claimant's age,
     education, work experience, and residual
     functional capacity, there are jobs that
     exist in significant numbers in the
     national economy that the claimant can
     perform (20 CFR 404.1569 and
     404.1569(a)).

11.  The claimant has not been under a
     disability, as defined in the Social
     Security Act, from April 29, 2011,
     through the date of this decision (20
     CFR 404.1520(g)).

(R. 20-27.)

     Explaining her finding that Plaintiff had not engaged in

19

substantial gainful activity since April 29, 2011, the ALJ

acknowledged Plaintiff's amended onset date of May 28, 2011, but

gave him the "benefit of the doubt" that he had not engaged in

substantial gainful activity since the earlier April date.  (R.

20.)  She also commented that Plaintiff continued to receive

unemployment compensation benefits and explained that this fact had

credibility implications.  (*Id.*)

> In order to be eligible to receive those
> benefits, the claimant must attest that he is
> ready, willing, and able to work.  This
> representation is inconsistent with the
> position now taken by the claimant that he is
> disabled and unable to engage in any
> substantial gainful employment.  On the one
> hand, the claimant attests that he is ready,
> willing, and able to work in order to take
> advantage of, and receive monetary benefits.
> Yet, on the other hand, the claimant asserts
> that he is disabled in order to qualify for,
> and receive, additional monetary benefits.
> While the receipt of unemployment benefits
> does not constitute substantial gainful
> activity that would disqualify the claimant
> under step one of the analysis, the
> inconsistent positions taken by the claimant
> have a direct bearing on the credibility of
> the claimant's allegations of disability.

(R. 20.)

In making her residual functional capacity determination, the

ALJ determined that Plaintiff's medically determinable impairments

could reasonably be expected to cause his alleged symptoms, but she

found that Plaintiff was not completely credible regarding his

statements concerning the intensity, persistence and limiting

effects of the symptoms.  (R. 24.)  She found that although the

20

treatment records supported some degree of limitation, they did "not support greater functional limitations than those set forth in the residual functional capacity." (*Id.*) The ALJ concluded MRI results which the radiologist determined to be essentially unchanged from April of 2010 to June of 2011 did not support a finding of disability because Plaintiff was working in April of 2010. (*Id.*) The ALJ concluded that clinical findings were consistent with the "relatively benign" findings documented on the MRI films. (*Id.*) Citing specific findings, the ALJ also concluded that the treatment notes of Dr. Rajjoub, the specialist to whom Plaintiff was referred by his primary care physician, did not support a greater degree of limitation. (*Id.*)

The ALJ reviewed Plaintiff's allegations regarding daily living activities and found them not to be persuasive when considered in conjunction with treatment records. (R. 24.) The ALJ again found it significant that Plaintiff did not leave work in April of 2011 due to his impairments. (*Id.*) She concluded the fact that Plaintiff was laid off and collecting unemployment compensation benefits since that time suggested he was capable of performing work at some level. (*Id.*)

The ALJ reviewed the opinion evidence including two medical source statements from Dr. Herberg. (R. 25.) She gave great weight to Dr. Herberg's opinion that Plaintiff had no mental functional limitations. (*Id.*) Because she found Dr. Herberg's

21

opinions about Plaintiff's physical limitations were not supported by MRI films or clinical findings on physical examination, the ALJ determined that Dr. Herberg had overestimated these limitations. (*Id.*)  The ALJ also noted that the opinion lacks any explanation in terms of signs or laboratory findings to support each of the limitations set out in the opinion.  (*Id.*)

The ALJ also gave little weight to Dr. Conley's opinion that Plaintiff would be limited to less than sedentary work and could be expected to be out of work three to four times per month.  (*Id.*) The ALJ's conclusion was based on a lack of support in the record as a whole and lack of explanation for the opinion rendered.  (*Id.*)

The ALJ gave some weight to the State agency psychological consultant's opinion that Plaintiff's mental impairments are not severe as defined in the regulations.  (R. 25.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[7]  It is necessary for the

---

[7]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of

22

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that

---

substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

exist in the national economy that Plaintiff is able to perform.
(R. 26.)

## III. Standard of Review

This Court's review of the Commissioner's final decision is
limited to determining whether there is substantial evidence to
support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft
v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence
means "more than a mere scintilla.  It means such relevant evidence
as a reasonable mind might accept as adequate to support a
conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see
also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third
Circuit Court of Appeals further explained this standard in *Kent v.
Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a
> talismanic or self-executing formula for
> adjudication; rather, our decisions make
> clear that determination of the existence *vel
> non* of substantial evidence is *not* merely a
> quantitative exercise.  A single piece of
> evidence will not satisfy the substantiality
> test if the Secretary ignores, or fails to
> resolve, a conflict created by countervailing
> evidence.  Nor is evidence substantial if it
> is overwhelmed by other evidence--
> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion.  *See* [*Cotter*, 642 F.2d] at 706
> ("'Substantial evidence' can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted).  The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social

> security disability cases ceases to be merely
> deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to
analyze all evidence.  If she has not done so and has not
sufficiently explained the weight given to all probative exhibits,
"to say that [the] decision is supported by substantial evidence
approaches an abdication of the court's duty to scrutinize the
record as a whole to determine whether the conclusions reached are
rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir.
1979).  In *Cotter*, the Circuit Court clarified that the ALJ must
not only state the evidence considered which supports the result
but also indicate what evidence was rejected: "Since it is apparent
that the ALJ cannot reject evidence for no reason or the wrong
reason, an explanation from the ALJ of the reason why probative
evidence has been rejected is required so that a reviewing court
can determine whether the reasons for rejection were improper."
*Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an
exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v.
Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement
that the ALJ discuss in its opinion every tidbit of evidence
included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d
Cir. 2004).  "[W]here [a reviewing court] can determine that there
is substantial evidence supporting the Commissioner's decision, . .
.  the *Cotter* doctrine is not implicated." *Hernandez v.*

*Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .")). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

### A. *General Considerations*

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406.  Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974).  As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406.  Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

### B. *Plaintiff's Alleged Errors*

As set out above, Plaintiff asserts the decision of the Social Security Administration is error because the ALJ's credibility

determination is not supported by substantial evidence.  (Doc. 15 at 4.)  We conclude this claimed error is cause for remand.

The Third Circuit Court of Appeals has stated that "[w]e 'ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor.'" *Coleman v. Commissioner of Social Security*, 440 F. App'x 252, 253 (3d Cir. 2012) (not precedential) (quoting *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)).  "Credibility determinations are the province of the ALJ and should only be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schwieker*, 717 F.2d 871, 873 (3d Cir. 1983)).

The Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered.  20 C.F.R. § 404.1529.  First, symptoms such as pain, shortness of breath, and fatigue will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings.  20 C.F.R. § 404.1529(b).  Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work.  *Id.*  In

so doing, the medical evidence of record is considered along with the claimant's statements.  *Id.*  Social Security Ruling 96-7p provides the following guidance regarding the evaluation of a claimant's statements about his or her symptoms:

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements.  In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true.  When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

SSR 96-7p.

Here the ALJ explained why she did not find Plaintiff completely credible.  (R. 20, 24.)  She found that Plaintiff's continuing receipt of unemployment compensation benefits undermined the credibility of his allegations of disability because he had to attest that he was ready, willing and able to work in order to receive those benefits.  (R. 20.)  After reviewing the evidence of record, the ALJ summarized her reasons for finding Plaintiff not completely credible: "the claimant's reason for leaving work, his application for and receipt of unemployment compensation, his level of activity, his rather routine and conservative care and his benign findings on examination."  (R. 24.)

29

Plaintiff argues the ALJ's credibility determination is error for three reasons: 1) the ALJ incorrectly found that Plaintiff was laid off from work for reasons unrelated to his disability; 2) the ALJ improperly relied upon Plaintiff's receipt of unemployment benefits; and 3) the ALJ mischaracterized Plaintiff's level of daily activity. (R. 4-14.)

## 1.   **Reason for Leaving Work**

Regarding the ALJ's characterization of Plaintiff's reason for leaving work, Plaintiff points to the ALJ's statement that Plaintiff "'did not leave work in April of 2011 due to his impairments but due to a layoff,'" and argues the statement is not supported by the record which shows that he was laid off due to his inability to perform the physical functions of his job. (Doc. 15 at 6 (quoting R. 24).)   Defendant asserts that this represents harmless error, citing *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005), for the principle that remand is not warranted where the error by the ALJ is harmless and would not affect the outcome of the case. (Doc. 18 at 18.)   We agree that the ALJ misstated the reason Plaintiff stopped working.

As noted above, the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected

30

is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury*, 116 F. App'x at 330.

The record shows that the reason for leaving work cited by the ALJ is not the whole story in that she does not acknowledge Plaintiff's testimony that the layoff was due to his impairments. (*See* R. 51.)  Although it is correct that Plaintiff was laid off, he consistently reported that he stopped working due to his conditions/back pain and the layoff was related to these problems. He reported his listed conditions as the reason he stopped working in the Disability Report (R. 161); in the Supplemental Function Questionnaire, he stated he had not worked since May of 2011 because of pain (R. 127); at the ALJ hearing, he testified that he was laid off because he was missing work "due to the fact of my back and my employer, Jim Hanna, said he wanted to lay me off and see if I can get my back in better shape" (R. 51).  No evidence conflicts with Plaintiff's testimony that he stopped working because of his conditions.  Importantly, the ALJ clearly links her conclusion that Plaintiff's layoff was unrelated to his impairments with her finding that Plaintiff is capable of performing some work: "Moreover, . . . the claimant did not leave work in April of 2011

31

due to his impairments but due to a layoff and has collected unemployment compensation since that time, thus suggesting that the claimant is certainly capable of performing work at some level." (R. 24.)  Though the ALJ explains why she finds Plaintiff's credibility is undermined by his layoff and receipt of unemployment benefits (R. 20), the explanation does not resolve the conflict noted in the statement quoted above and cited by Plaintiff (Doc. 15 at 6).

Whether this error also renders the ALJ's credibility determination error is another question.  Defendant maintains it does not: it would not affect the outcome of the case because the ALJ's credibility analysis was based on her examination and consideration of many factors and all but her layoff statement support her conclusion that Plaintiff's statements about the intensity and severity of his symptoms were not entirely credible. (Doc. 18 at 18.)  We agree that our finding regarding the ALJ's consideration of Plaintiff's reason for leaving work does not necessarily render the ALJ's credibility determination error because the ALJ cited several reasons for her determination.  (*See* R. 24.)  To decide whether this error is harmless, as Defendant asserts, we must look at whether the other reasons cited by the ALJ in support of her credibility determination provide substantial evidence for her decision.  *Albury*, 116 F. App'x at 330.  Thus, we now turn to Plaintiff's next claimed basis of error: the ALJ's

32

consideration of unemployment benefits in determining Plaintiff's credibility.

## 2.   <u>Receipt of Unemployment Compensation Benefits</u>

Plaintiff asserts that the ALJ improperly relied on Plaintiff's receipt of unemployment benefits to find him less than fully credible.  (Doc. 15 at 7.)  Defendant contends that the law of this circuit indicates otherwise.  (Doc. 18 at 16-17.)  We conclude the ALJ was entitled to consider Plaintiff's receipt of unemployment benefits, but we are unable to determine whether she did so properly.

The Third Circuit Court of Appeals found that an ALJ properly considered a claimant's receipt of unemployment compensation benefits in determining the claimant's credibility in *Myers v. Barnhart*, 57 F. App'x 990, 997 (3d Cir. 2003) (not precedential) (citing *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997) (application for unemployment compensation benefits can adversely affect a claimant's credibility because of admission of ability to work required for unemployment benefits)).  The receipt of unemployment benefits is just one of many factors which are to be considered in determining whether a claimant is disabled.  57 F. App'x at 997.  This approach is outlined in the Social Security Memorandum cited by Plaintiff. (Doc. 15 at 8 (citing Chief Administrative Law Judge Frank A. Cristaudo's November 15, 2006, Memorandum (Doc. 15-1 at 1)).)

Chief ALJ Cristaudo explains that the "[r]eceipt of unemployment benefits does not preclude the receipt of Social Security disability benefits.  The receipt of unemployment benefits is only one of many factors that must be considered in determining whether the claimant is disabled." (Doc. 15-1 at 1.)  The Memorandum cites *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999), where the Court held that a claim for Social Security disability benefits can be consistent with a claim for relief under the American with Disabilities Act ("ADA").  Finding significant the Court's notation that a person can qualify for Social Security disability benefits even though he or she remains capable of performing some work, Chief ALJ Cristaudo found the same logic applied to unemployment compensation benefits.  (Doc. 15-1 at 1.)  He additionally noted that

> it is often uncertain whether we will find a person who applies for unemployment benefits ultimately to be disabled under our rules, and our decisionmaking process can be quite lengthy.  Therefore, it is SSA's position that individuals need not choose between applying for unemployment insurance and Social Security disability benefits.
>
> However, application for unemployment benefits is evidence the ALJ must consider together with all of the medical and other evidence.  Often, the underlying circumstances will be of greater relevance than the mere application for and receipt of the benefits. . . .
>
> Accordingly, ALJs should look at the totality of the circumstances in determining the significance of the application for

34

> > unemployment benefits and related efforts to
> > obtain employment.

(Doc. 15-1 at 1.)

We agree with this reasoning.  We find particularly significant Chief ALJ Cristaudo's recognition of the reality of the lengthy agency decisionmaking process.[8]  Here the ALJ did not acknowledge that the receipt of unemployment compensation benefits is not necessarily inconsistent with a claim for Social Security disability benefits.  Rather, she highlighted the inconsistency of the representations as a reason to undermine Plaintiff's credibility.  (*See* R. 20.)  This blanket assessment is problematic, particularly when combined with the less than accurate portrayal of the reason Plaintiff left his job at Hanna Electric.  Overall, we cannot tell from the ALJ's credibility analysis whether she looked at the totality of the circumstances in determining the significance of the application for unemployment benefits.

Again, whether the error is harmless depends on whether the other reasons cited by the ALJ in support of her credibility determination provide substantial evidence for her decision.  *Albury*, 116 F. App'x at 330.  Thus, we must look to the other reasons relied upon by the ALJ before deciding whether substantial evidence supports her decision on the credibility issue.

---

[8]  Here the ALJ rendered his decision on December 17, 2012, over one year after Plaintiff applied for benefits on August 19, 2011.  The decision became final on March 12, 2014.  (R. 1.)

3.   **Activities of Daily Living**

Plaintiff asserts the ALJ also erred in finding Plaintiff's level of activity undermines his credibility in that evidence shows that his daily functioning was more limited than the description provided by the ALJ.  (Doc. 15 at 11.)  Defendant maintains the ALJ properly considered Plaintiff's statements regarding his activities of daily living.  (Doc. 18 at 16.)  We conclude the ALJ's limited review of Plaintiff's statements regarding his level of activity is problematic.

"A fact finder has the right to reject . . . testimony, but failure to indicate rejection could lead to a conclusion that [the ALJ] neglected to consider it at all."  *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 149 (3d Cir. 2010) (not precedential) (citing *Baerga v. Richardson*, 500 F.2d 309, 311 (3d Cir. 1974)). In reviewing an ALJ's consideration of a plaintiff's subjective testimony the Third Circuit Court of Appeals has observed the following:

> "It is incumbent upon the examiner to make specific findings[,] the court may not speculate as to findings." [*Dobrowolsky*, 606 F.2d] at 409.  Similarly, a district judge may not speculate as to the findings which an ALJ would make when appropriate and relevant evidence is presented.
>
> In fact, should the ALJ fail to make comprehensive findings, his holding must be reversed and remanded for further findings. *Hargenrader v. Califano*, 575 F.2d 434 (3d Cir. 1978).

*Smith v. Harris*, 644 F.2d 985, 989 (3d Cir. 1981).  Although
"[i]nconsistencies in a claimant's testimony or daily activities
permit an ALJ to conclude that some or all of the claimant's
testimony about [his] limitations or symptoms is less than fully
credible," *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 146 (3d
Cir. 2007) (not precedential), the ALJ must not only identify which
evidence she relies on to support her decision but must indicate
the evidence she rejects and provide reasons for discounting the
evidence, *Burnett*, 220 F.3d at 121-22.  "In the absence of such an
indication, the reviewing court cannot tell if significant
probative evidence was not credited or simply ignored."  *Cotter*,
642 F.2d at 705.

The ALJ stated that Plaintiff's allegations regarding his
daily living activities were not persuasive.  (R. 24.)
Specifically, the ALJ set out the following:

> He performs housework, including dishes and
> laundry.  He drives and shops for food
> (Exhibit 2E).  While he alleges difficulties
> climbing stairs, he testified that he climbs
> stairs in his home several times per day.  He
> testified that he uses a cane but this cane
> was not prescribed by any of his treatment
> providers nor do the treatment records
> indicate that any assistive device is
> medically necessary.  He watches television
> and enjoys Facebook and E-bay on his
> computer.

(R. 24.)

Plaintiff, by way of example, points to testimony the ALJ did
not consider: his wife took care of the dogs; he sometimes found it

37

hard to dress; it hurt to shave so he had grown a beard; he no longer cooked as much as he used to; his chores consisted of some dusting and doing some laundry, but these things took all day due to the need to take breaks; he could not vacuum the pool; and it took him two hours to shop due to the need to take breaks.  (Doc. 15 at 12 (citing R. 120, 121).)   Plaintiff further avers that the ALJ did not consider testimony about activities he no longer engaged in because of his impairments: where he previously enjoyed working on cars, hunting, working, and camping, he now did none of these things.  (Doc. 15 at 12 (citing R. 122).)   Plaintiff also notes that the ALJ did not address his wife's corroboration of his limitations in daily living activities.  (Doc. 15 at 12 (citing R. 131-38).)

Our review of the record shows the ALJ did not discuss probative evidence related to Plaintiff's activities of daily living.  Not only did she not review the specific evidence cited by Plaintiff, the ALJ did not discuss Plaintiff's wife's testimony which largely corroborated Plaintiff's limitations of daily living.  (*See* R. 24-25.)   Defendant does not argue that the ALJ considered all probative evidence on this issue.  (*See* Doc. 18 at 16.)   Thus, within the legal framework set out above, we must conclude the ALJ did not properly consider evidence regarding Plaintiff's activities of daily living.

Our conclusion that three of the reasons relied upon by the

ALJ to undermine Plaintiff's credibility were not properly considered is not the end of our inquiry.  We must now decide whether the other reasons cited by the ALJ in support of her credibility determination--conservative care and benign examination findings--provide substantial evidence for her decision.  *Albury*, 116 F. App'x at 330.

## 4.   Medical Care and Examination Findings

In addition to the three discredited reasons, the ALJ found that Plaintiff's "rather routine and conservative care and his benign findings on examination" undermined his credibility.  (R. 24.)  We conclude these reasons do not provide substantial evidence in support of the ALJ's credibility determination.

The Third Circuit Court of Appeals has acknowledged that "[c]omplaints of disabling back pain are the most difficult types of claims to resolve with any degree of certainty."  *Taybron v. Harris*, 667 F.2d 412, 415 (3d Cir. 1981) (citations omitted).  *Taybron* added that

> [w]e have on other occasions said that "even
> pain unaccompanied by objectively observable
> symptoms which is nevertheless real to the
> sufferer and is so intense as to be disabling
> will support a claim of disability benefits."
> *Bittel v. Richardson*, 441 F.2d 1193, 1105 (3d
> Cir. 1971) quoting *Ber v. Celebrezze*, 332
> F.2d 293, 299 (2d Cir. 1964).  *See also*
> *Northcutt v. Califano*, 581 F.2d 164, 166 (8th
> Cir. 1978).  Disability claims based on pain
> are difficult to resolve because proof of
> pain is often made by means of subjective
> evidence.  *See Bittel*, 441 F.2d at 1194; *De*
> *Paepe v. Richardson*, 464 F.2d 92, 94 (5[th]

39

Cir. 1972).

667 F.2d at 415.   Subjective testimony about pain is entitled to weight if it is supported by competent medical evidence.   *Taybron*, 667 F.2d at 415; *Dobrowolsky*, 606 F.2d at 409.   Further, "when the claimant has worked for a long period of time, his testimony about his work capabilities should be accorded substantial credibility." *Taybron*, 667 F.2d at 415 n.6 (citing *Dobrowolsky*, 606 F.2d at 409). After discussing the difficulty in resolving claims based on disabling back pain at the administrative level, *Taybron* noted the similar difficulty in judicial review of these claims.   667 F.2d at 415.

This case is not an exception.   While it is true that Plaintiff had conservative care and examination findings did not dictate more aggressive treatment, we cannot say that the ALJ's credibility determination is supported by substantial evidence. Here Plaintiff's treating physicians found the functional limitations consistent with Plaintiff's impairments (R. 236, 309) and the SDM agreed with Dr. Herberg's limitations and restrictions (R. 68-69).[9]  No medical source opined that Plaintiff's reported

---

[9]  As noted above, *Yorkus* explains that a single decision-maker is a non-examining, non-medical employee at the state agency level.  2011 WL 7400189, at *4.  *Yorkus* cites "significant case law" and "the Agency's own policy" in concluding that a SDM's RFC assessment is not to be accorded any evidentiary weight when an ALJ is deciding a case at the hearing level.  2011 WL 7400189, at *4 (listing cases and administrative documents).  Thus, our reference to SDM Seelye's findings is not intended to indicate that her RFC assessment was due any evidentiary weight.

symptoms were not consistent with his impairments.  Further,
Plaintiff testified that he worked at his last job for over ten
years.  (R. 51.)  Thus, his testimony about work capabilities
satisfies the longevity requirement and was "entitled to
substantial credibility."  *Taybron*, 667 F.2d at 415 n.6.

This review of the evidence and the bases for the ALJ's
credibility decision shows it is not a case where the *Cotter*
doctrine (requiring the ALJ to indicate the probative evidence she
rejects and provide reasons for discounting the evidence) is not
implicated as is the case where a reviewing court can determine
that there is substantial evidence supporting the Commissioner's
decision.  *Hernandez*, 89 Fed. Appx. at 774.  In view of the
importance of credibility in cases of alleged disability due to
back pain, the assessments of Plaintiff's treating physicians, and
the lack of conflicting opinion evidence, we are unable to say that
the ALJ's determination that Plaintiff is not disabled is based on
substantial evidence.

### V. Conclusion

For the reasons discussed above, we conclude Plaintiff's
appeal is properly granted.  This matter is remanded to the Acting
Commissioner for further consideration consistent with this
opinion.  An appropriate Order is filed simultaneously with this
Memorandum.

                                    S/Richard P. Conaboy
                                    RICHARD P. CONABOY
                                    United States District Judge

DATED: October 20, 2014